UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| v. | ) ) | No. 19-CR-10082-DPW |
| XIAONING SUI,<br>    Defendant | ) ) ) ) | |

## SENTENCING MEMORANDUM ON BEHALF OF XIAONING SUI

Now comes the defendant Xiaoning Sui, by and through undersigned counsel, and hereby respectfully moves this Honorable Court, pursuant to 18 U.S.C. § 3553(a), to deviate from the applicable guideline range and to accept the agreed-upon disposition of incarceration for a period of time-served (157 days or approximately five months and one week), a fine in an amount not to exceed the guideline range, and a special assessment of $100. *See* Dkt. 29 at 3.[1] While such sentence is below the advisory guideline range as calculated by probation, the defense respectfully submits that it (1) constitutes a sufficiently serious punishment – one that sends a very serious message to both Ms. Sui and the community at large – particularly when the conditions of pre-sentence confinement are considered, (2) it properly takes into consideration

---

[1] The plea agreement also provides for a 12-month term of supervised release. However, the probation department has informed the parties that the requirements of post-conviction supervision are different than the requirements of pre-trial supervision and therefore cannot be accomplished if the defendant resides in her home country of Canada. Since supervised release is not mandatory in this case, the probation department, by and through Martha Victoria, recommends there be no term of supervised release imposed. Consistent with probation's recommendation, the parties do not object to excluding a term of supervised release from the sentence imposed.

1

Ms. Sui's role, the aberrant nature of her conduct, and her prompt acceptance of responsibility, (3) it would avoid sentencing disparities with other similarly situated defendants, and (4) it is consistent with the overall objectives of § 3553(a), and the cardinal principle expressed therein that the Court should impose a sentence sufficient, but not more than necessary, to comply with the purposes of § 3553(a).

## A. RELEVANT BACKGROUND AND CIRCUMSTANCES

### 1. Personal and Family Background

Born on October 5, 1970 in Shanghai, China, Ms. Sui is 49-years-old, married to a loving and supportive husband, and is the principal caretaker of the family's only child Eric, age 19. PSR at ¶ 91. Along with her sister, she was raised by two caring parents in a middle-class background. PSR at ¶ 92. Her father worked as a college professor and her mother was an engineer. PSR at ¶ 93-94. In 1981, the family moved from Shanghai to Nanjing City in the Jiangsu Province of China. PSR at ¶ 91. There, Ms. Sui finished high school and went on to earn a Bachelor's degree in Electronics from the Panda Electronic Technology College. PSR at ¶ 105. For nearly a decade, Ms. Sui worked in a television/electronics factory as a factory technician. PSR at ¶ 108. In 1998, she and her husband married and in early 2000 the family welcomed their only child. PSR at ¶ 96. Ms. Sui left her job at the television/electronics factory during her pregnancy, but returned to employment at a different company as an office manager in 2001. PSR at ¶ 109. Six years later, Ms. Sui left her employment to spend more time with her son. PSR at ¶ 107. As Ms. Sui's sister – who resides with her and knows her best – describes in her letter, Ms. Sui is deeply committed to well-being of her family and her son:

> She is a good mother and a daughter who loves life and family. She brought up

>her son, and was there every step of the way, never absent in his development. Every time her son was in training, or playing a game, no matter how cold or hot the weather was, she sat there to watch, and helped him analyze after the game, in order to improve the game

Letter of Xiaomin Sui, attached hereto as Exhibit 1.

In 2014, seeking better educational opportunities for her son, Ms. Sui received permanent residency status in Canada. PSR at ¶ 91. She relocated to Canada in 2015 where her son attended high school and is now in his first year of college. PSR at ¶ 98. With Ms. Sui's assistance, her sister and niece similarly relocated to Canada for better educational opportunities. Ms. Sui funds her niece's tuition and both her sister and niece reside with Ms. Sui in her Vancouver-area residence. Exhibit 1. Ms. Sui's husband continues to reside and work in China to financially provide for the family, while Ms. Sui resides in Canada and continues to be the principal caretaker for their child. Along with her son, Ms. Sui regularly travels to China during winter and summer school breaks to spend time with her husband and her family. PSR at ¶ 96. Ms. Sui's husband similarly travels during his vacations to spend time with the family in Canada. *See id.*

Ms. Sui's civic and charitable contributions extend well beyond her family. Since her son was five-years-old, "she helped other parents who could not drive their kids by driving their kids to the tennis training and bringing them back…", Exhibit 1. When her son's team went to compete and "the hotel [did] not have washing machines, she helped young athletes wash their underwear and sportswear by hand..." Exhibit 1. In the aftermath of an earthquake in 2008, Ms. Sui donated substantial sums to the relief effort, and even during her confinement in Spain, Ms. Sui requested her husband donate 2

3

million Yuan (approximately $280,000) to help combat the novel coronavirus.  Exhibit 1.

**2. Offense Conduct**

In 2018, Ms. Sui was working with a recruiter based in Florida ("Recruiter 1") to assist her son, who was a tennis player, with the athletic college admissions process.  PSR at ¶ 40.  Recruiter 1 "matched high school tennis players with college tennis coaches to facilitate the players' potential recruitment as part of the college admissions process."  Superseding Information at ¶ 7.  In early August of 2018, Recruiter 1 contacted William "Rick" Singer for his assistance with the college admission process for Ms. Sui's son, PSR at ¶ 40, and on August 24, 2018, Ms. Sui, Mr. Singer, and Recruiter 1 participated in a conference call aided by a Chinese translator.[2]  PSR at ¶ 44.  During the call Ms. Sui agreed to a fee of $400,000 so that Mr. Singer would assist in facilitating her son's admission to UCLA.  PSR at ¶ 45.  Ms. Sui was told by the translator that Mr. Singer has "a special way of writing" the application that would guarantee her son's admission to UCLA.  *See Id.*   During this initial August 2018 call, Mr. Singer never disclosed that any portion of the $400,000 Ms. Sui agreed to pay was intended to be a bribe or that any portion of the fee was related to gaining admission through the assistance of a UCLA coach.  *See id.*  Ms. Sui also requested of Mr. Singer and Recruiter 1 on this call that the arrangement not be disclosed to her son.  *See Id.*

Following the call, Mr. Singer worked behind the scene to create a fake soccer profile and to make arrangements with Jorge Salcedo, UCLA's soccer coach, to admit her son as a purported soccer recruit.  PSR at ¶ 46-54.  There is no evidence that Ms. Sui was involved in

---

[2] Ms. Sui does not speak English and required the assistance of a translator to communicate with Mr. Singer and his staff.

4

fabricating the athletic profile or her son's college applications, nor have any knowledge that a bribe was necessary to secure her son's admission to UCLA.

In a subsequent call, on October 24, 2018, Mr. Singer, who was at the time cooperating with the Government and who had already made all of the arrangements with Coach Salcedo, told Ms. Sui through a translator, unexpectedly and for the first time, that her "son is admitted to this school through UCLA's soccer team." PSR at ¶ 55. Mr. Singer told Ms. Sui that she needed to send $100,000 that would be "directly transferred to that soccer coach." *See id.* Ms. Sui was told that "although your son is a tennis player, because there is a place in soccer team, so it is the soccer team that takes your son." *See id.* During the call, Ms. Sui agreed to make the $100,000 payment and on October 26, 2018, she wired the funds to an account controlled by Mr. Singer and located in the District of Massachusetts. PSR at ¶ 55-58. Thereafter, Mr. Singer sent a $100,000 check to Coach Salcedo, PSR at ¶ 58-59, and Ms. Sui's son was provisionally admitted to UCLA as a student-athlete. PSR at ¶ 61. On February 15, 2019, following a request by Mr. Singer, Ms. Sui wired an additional $300,000 to an account controlled by Mr. Singer as the balance of his agreed upon fee for facilitating her son's admission. PSR at ¶ 65-66. The defense believes the funds were forfeited to the Government in partial satisfaction of Mr. Singer's forfeiture obligations.

### 3. Arrest and Extradition

Ms. Sui was charged in this matter pursuant to a sealed Indictment on March 5, 2019. Dkt. 1. At the time of the Indictment, Ms. Sui was a Chinese citizen and a Canadian permanent resident, who principally resided in Surrey, British Columbia, Canada. Ms. Sui was never informed and had no notice of the charges pending against her until her arrest in Spain on

September 17, 2019, when she was travelling in Europe with a return ticket to Canada.  Upon her arrest, Ms. Sui was, for the first time, informed of the instant charges.  Unlike many other criminal defendants, Ms. Sui has not sought to justify or excuse her offense. Instead, she promptly retained counsel in Spain and the United States and on or about October 3, 2019, Ms. Sui, through the undersigned, informed the Government that she is waiving any defenses to extradition, wishes to expedite her transfer to the United States, and that she intends to resolve the allegations against her.  Ms. Sui subsequently entered into a plea agreement and was transferred, after more than five months in a Madrid prison, to the United States on February 20, 2020.  The delay was not Ms. Sui's fault; instead she did everything in her power, including retaining additional Spanish counsel, to expedite the prolonged periods between her agreement to not contest extradition (October) and her finally being released to the United States Marshals.

Pending extradition, Ms. Sui was held at Madrid V Penitentiary Center, Soto del Real. There, she was confined to her cell for approximately fifteen hours per day.  For approximately one month, she was in a cell alone.  However, even when she was housed with another inmate, Ms. Sui, who does not speak Spanish or English, was unable to communicate with her cellmate or with any of the staff members at the facility.  For a vast majority of the time there was no other Mandarin speaking inmate at the facility.  With her family members thousands of miles away, Ms. Sui spent 157 days in quasi-isolation.  PSR at ¶ 103   Unable to cope with anxiety and sleeplessness, Ms. Sui was prescribed and for many months took anti-anxiety and sleep-aid medication given to her by the medical staff at the facility, medications she did not use before her arrest and has stopped using since. *See id.*  In sum, Ms. Sui's conditions of confinement were harsh, isolating, and far more punitive than what any of the related parent-defendants have been

subject to.

## B. LEGAL PRINCIPLES

### 1. General Sentencing Framework

With the Supreme Court decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), sentencing options available to district courts have significantly broadened. *See, e.g., United States v. Taylor*, 532 F.3d 68, 69 (1st Cir. 2008). "[O]nce the [guideline sentencing range ("GSR")] is properly calculated, 'sentencing becomes a judgment call' for the court, and the court may construct a sentence varying from the GSR 'based on a complex of factors whose interplay and precise weight cannot even be precisely described.'" *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008) (quoting *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008)). To the extent there exist "sound, case-specific reasons" to do so, a sentencing court is authorized to deviate from the guidelines. *Martin*, 520 F.3d at 91. The post-*Gall* sentencing inquiry is "broad, open-ended, and significantly discretionary." *Id.* at 92.

### 2. The Court should impose the agreed-upon sentence of time-served

For all of the following reasons, the defense respectfully submits that the agreed-upon disposition of incarceration for a period of time-served (157 days or approximately five months and one week), a fine in an amount not to exceed the guideline range, and a special assessment of $100 constitutes a fair and just sentence in this case, *i.e.*, one that is "sufficient, but not more than necessary," to meet the sentencing goals enumerated in § 3553(a).

First, while Ms. Sui does not seek to diminish the gravity of her offense, the defense respectfully submits that the sentencing guideline, as calculated by probation, significantly

overstate the seriousness of Ms. Sui's role in the underlying offense.  As Judge Rakoff observed in the context of the Guidelines' loss table, a sentencing process driven largely if not exclusively by mathematics ignores many important elements of section 3553(a):

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012).  Here, the sentencing guidelines tethered to the $100,000 payment is prescribed largely for financial crimes where there is a loss to victims or a gain to the perpetrator and does not easily encompass the unique circumstances of a parent agreeing to a requested fee charged by a prominent consultant recommended to the parent by another trusted consultant even including the unexpected disclosure that a portion of the fee is intended by the consultant to be paid to a college coach for his assistance.

Ms. Sui, who had no prior experience with the United States college admission system, relied on Recruiter 1 and, based on his advice, retained Mr. Singer to assist her son with the college admissions process. During their initial, translated phone call, Mr. Singer and Recruiter 1 made no disclosure that Mr. Singer intends to fabricate her son's athletic profile or to bribe college administrators.  After Ms. Sui agreed to retain Mr. Singer, he and his colleagues created a false athletic profile and arranged an agreed-upon bribe with Coach Salcedo.  Ms. Sui was not involved in fabricating the profile or the admissions application, had no part in the planning or coordination of the $100,000 bribe, and was, until the October 24, 2018 call, unaware of Mr.

8

Singer's plan to bribe Coach Salcedo to admit her son as a purported soccer recruit. It was not until the October 24, 2018 call that Mr. Singer, who was by then cooperating with the Government, disclosed to Ms. Sui that her son was going to be admitted through the UCLA soccer team and that a $100,000 bribe was going to be paid to Coach Salcedo in exchange for her son's admission. While Ms. Sui agreed to the plan and paid the bribe amount, she, unlike many of the other parents, was not an active participant in the underlying crime, did not enlist her son to participate in the scheme, did not participate or encourage the creation of a false athletic profile, and did not have regular conversations with Mr. Singer in which they were more deeply involved in his misconduct.

Second, Ms. Sui is a first-time offender, having never before been convicted of a crime. From a sentencing perspective, this is important.[3] When the offense of conviction is an extreme departure from an otherwise well-led life and there is no likelihood of re-offense, a variance from the guideline range may be warranted. *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite an 18-24-month guideline range, where appellate court construed district court to have termed the offense an "isolated mistake" in the context of Defendant's otherwise long and upstanding life). Ms. Sui has led an exemplary law-abiding life that stands in stark contrast to the offense she finds herself convicted of. The goal of specific deterrence or even rehabilitation are non-factors in assessing the necessary punishment.

Moreover, the goal of general deterrence similarly does not require an additional period

---

[3] The Sentencing Guidelines, recognizing this fact, now direct courts to "consider imposing a sentence other than a sentence of imprisonment" for certain first-time offenders.

9

of incarceration.  No rational person aware of what has occurred to Ms. Sui would ever knowingly and intentionally choose to endure what she has experienced over the last nine months.  Anyone paying even an iota of attention to Ms. Sui's case and other related cases has already been adequately deterred.  An additional prison sentence on top of what Ms. Sui has already served will have no additional deterrent benefit.  Indeed, as numerous studies have shown, there is no decisive evidence to support the conclusion that harsh, rather than discrete and short finite, sentences actually have a general and specific deterrent effect on potential white-collar offenders. Zvi D. Gabbay, *Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("[I]nreases in severity of punishment [for white-collar crimes] do not yield significant (if any) marginal deterrent effects…. Three National Academy of Science panels … reached that conclusion as has every major survey of the evidence."); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (noting "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders" (citing Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)).

Third, a downward variance is appropriate to "avoid unwarranted disparities in sentences among [similarly-situated] defendants." 18 U.S.C. § 3553(a)(6); *see also Gall v. United States*, 128 S. Ct. 586, 600 (2007) (appropriate for judges to impose below guideline sentence based on "need to avoid unwarranted similarities among other [defendants] who [are] not similarly

---

U.S.S.G § 5C1.1. Application Note 4.

situated."). There have been at least nine other criminal cases filed in this District involving charges relating to the college admissions scandal. All told, at least 53 individuals have been charged. Eighteen defendants have been sentenced to date, including sixteen parent-defendants and two college coaches. Of these, only three parent-defendants received sentences of incarceration greater than 157 days or approximately five-months and one-week:

- Douglas Hodge was sentenced to nine months' incarceration for "paying bribes totaling $850,000, over more than a decade, to secure the admission of two children to USC and two children to Georgetown." *See United States v. Hodge,* No. 19-cr-10080-NMG, Dkt. 816 at 3. Mr. Hodge participated in Mr. Singer's scheme "over a longer period of time, than any of the defendants charged to date" and also "sought unsuccessfully to use bribes to secure the admission of a fifth child to [LMU]." *See id.* He involved his children in the fraud and agreed, in a recorded conversation with Mr. Singer, to cover-up the crimes. *See id.* at 6.

- Elizabeth Henriquez was sentenced to seven months' incarceration for participating in both the "College Entrance Exam Cheating Scheme" and the "College Recruitment Scheme". Ms. Henriquez, along with her husband, "cheated on more standardized tests than any other co-conspirator: twice for their oldest daughter and three times for their youngest daughter." *See United States v. Henriquez,* No. 19-cr-10080-NMG, Dkt. 816 at 10. Ms. Henriquez also paid Mr. Singer $400,000 to have her daughter admitted to Georgetown as a purported tennis team recruit, deducted the payment from her tax returns, and agreed with Mr. Singer to cover-up the crimes. *See id.* at 12.

- Toby MacFarlane was sentenced to six months' incarceration for paying $400,000 to Mr. Singer to have his two children admitted to USC as purported athletic recruits. *See United*

11

*States v. MacFarlane,* No. 19-cr-10131-NMG, Dkt. 334 at 1.  Mr. MacFarlane "agreed with Singer to misrepresent his children's athletic abilities and to lie to USC employees if they asked…" *Id.*  Mr. MacFarlane also improperly deducted his payments to Mr. Singer from his tax returns and "agreed with Singer to mislead the IRS to conceal the scheme." *Id.* at 6.

The other thirteen parent-defendants, many of whom were significantly more involved in Mr. Singer schemes, received significantly shorter sentences.  For example, the eight parent-defendants who participated in only the test cheating scheme received sentences of 30 days prison or less. One received probation without incarceration. The two parent-defendant who participated in both schemes received a prison sentence of five months. (Augustus Huneeus in No. 19-CR-10117-IT and Michelle Janavs in No. 19-CR-10081-NMG).  And, the three parent-defendants who participated only in the recruitment scheme received prison sentences of two and four months. (Jeffrey Bizzack in 19-CR-10222-DPW, and Devin Sloan and Stephen Semprevivo in No. 19-CR-10117-IT).

Unlike Ms. Sui, however, Mr. Sloan affirmatively involved his son in the scheme; participated in "elaborate ways," including lying to high school counselors, lying to USC admissions staff, and photoshopping images of son; agreed to lie to the IRS in the context of Singer's "audit"; and after pleading guilty "continued to show a striking lack of remorse and disdain for the law." *United States v. Sloan,* No. 19-CR-10117 IT, Dkt. 445 at 2-3.  Similarly, Mr. Semprevivo affirmatively involved his son in the scheme, had complete insight into the details of the scheme, and after pleading guilty exhibited a "complete lack of remorse" (including filing a lawsuit against Georgetown to stop his son from being expelled). *United States v. Semprevivo,* No. 19-CR-10117 IT, Dkt. 466 at 1-4, 6.

The defense respectfully urges that fundamental fairness and justice mandate that Ms. Sui's sentence be consistent with those previously imposed in related cases.

Finally, Ms. Sui's particularly harsh condition of pre-trial confinement warrant deviating or departing from the applicable guideline range. Rather than spend her incarceration in a minimum-security camp like many of the other parent-defendants, Ms. Sui spent 157 days confined in a foreign country, thousands of miles away from family or friends, without the ability to effectively communicate with fellow inmates or staff.  As a result of these conditions, Ms. Sui developed mental health problems, including anxiety and sleeplessness, and was, for months, prescribed anxiety and sleep-aid medication by the facility.  *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (vacating sentence and remanding to the district court to consider departure based on conditions of pre-trial confinement in the Dominical Republic). Given Ms. Sui's particularly punitive conditions of pre-trial confinement, the defense respectfully submits that the agreed-upon resolution is a fair and just sentence, and no more than necessary given all pertinent facts and circumstances of this case.[4]

### C.  CONCLUSION

For all of the foregoing reasons, as well as additional grounds and reasons to be submitted to the Court on or before the date of sentencing, the defense respectfully requests this Honorable Court to impose a sentence of incarceration for a period of time-served (157 days or

---

[4] The defendant would further request that the Court consider that at the Government's urging, many months into his cooperation, Mr. Singer requested and received $300,000 from Ms. Sui just weeks before his plea of guilty which included a large monetary forfeiture.  In short, although forfeiture and fines are distinct, the defendant requests that this large payment, for which Ms. Sui received no benefit since UCLA withdrew its conditional acceptance of her son, be considered by the Court in determining an appropriate fine.

13

approximately five months and one week), a fine in an amount not to exceed the guideline range, and a special assessment of $100.

Respectfully submitted,

Xiaoning Sui
By her Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: May 11, 2020

### CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, May 11, 2020, a copy of the foregoing documents has been served via Electronic Court Filing system on all registered participants, including AUSA Eric Rosen.

**/s/ Martin G. Weinberg**
Martin G. Weinberg
